## ESNAULT-PELTERIE v. CHANCE VOUGHT CORPORATION.

No. 396.

Circuit Court of Appeals, Second Circuit.

July 17, 1933.

Fraser, Myers & Manley, Arthur C. Fraser, Edwin J. Prindle, and Eugene V. Myers, all of New York City (George W. Wickersham and R. Keith Kane, both of New York City, of counsel), for appellant.

Drury W. Cooper, C. Blake Townsend and Charles H. Keel, all of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This suit involves patent No. 1,115,795 for an aeroplane, granted November 3, 1914, on an application filed January 16, 1908, to a citizen of France. It relates to a mechanical structure in three alternative embodiments, all of which are "heavier-than-air" machines. The patent discloses and originally claimed

particular forms of distortable wing, movable tail construction of an aeroplane. None was ever put into commercial use.

■ This application is asserted to relate back to two French improvement patents filed January 19 and 22, 1907. The basic patent to these two was applied for in France December 19, 1906. The court below held properly that its subject-matter was dedicated to the public in this country because of the failure to file here within a year. Ely Norris Safe Co. v. Mosler Safe Co., 62 F.(2d) 524 (C. C. A. 2); U. S. Code title 35, § 32 (35 USCA § 32). The patent in suit claims the improvements of 1907; that is, a vertical arrangement of two control levers the horizontal arrangement of which, to effect the same controls in the same way appellee says, constitutes dedicated subject-matter.

■ The appellant prepared an application for a patent in the United States based on the French patent No. 372,753 and its improvements, patents Nos. 373,763 and 373,818, but filed it more than one year after filing application for the first French patent. He contends, however, that, since the applications for the two French improvement patents, on which the patent in suit was based, were filed before the French patent No. 372,753 was delivered, there is here, by virtue of title 35, § 32, U. S. Code (35 USCA § 32), an application for a patent which should have the same effect as if the application had been filed here on the dates on which the applications for the French improvement patents were made, and, the argument proceeds, No. 372,753 is not prior art. But section 32 provides:

"No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery, * * * unless the application for said foreign patent was filed more than twelve months * * * prior to the filing of the application in this country, in which case no patent shall be granted in this country."

Under the provisions of section 32, the appellant's failure to file an application for a patent in this country, based upon No. 372,753, resulted in a loss of the right to a monopoly for the invention or discovery of that patent, and he may not now succeed, even though such invention be described and claimed in the two French patents, on which the patent in suit is based, as an invention and discovery of the last-mentioned patents. The French law (article 18 of the Patent Law of France dated July 5, 1844, as amended) permits the patentee to claim improve-

ments on his patent within a year. The French patents, on which the patent in suit is based, are admittedly improvements on the French patent No. 372,753. It is only for the invention and discovery of such patents, over the invention of the first French patent, to which was attributed two levers, one for directional control and the other for lateral and fore and aft stability and instinctive movements, for which appellant could legally secure a patent in this country.

Patent to the Wrights, No. 821,393, granted in 1906, shows the basis of the practical art of flying heavier-than-air machines. See Wright Co. v. Herring-Curtiss Co., 211 F. 654 (C. C. A. 2); Wright Co. v. Paulhan (C. C.) 177 F. 261. There are three fundamental movements executed by an aeroplane while flying, and three controls are required. First, there is the up and down movement, called "pitch." The Wrights controlled this movement by their elevator. The pilot lay face downward in a cradle with his head toward the front of the machine, his hands grasping a roller, and, by twisting it, he could tilt the elevator to make the plane go up and down. Second, there is the movement in a horizontal plane called "yaw" as in a boat. This movement was accomplished by the Wrights by a vertical rudder at the back of the plane. Third, there is the roll or banking of the plane about a longitudinal horizontal axis. That keeps the plane on an even keel laterally, or tilts one wing higher than' the other when desired to bank the plane, as in turning. This the Wrights accomplished by distorting or warping the. tips of the wings. Wing warping has been superseded by ailerons or small hinged flaps at the rear of the wings. The second and third movements were controlled by the Wrights simultaneously by sidewise movement of the cradle, to the right or left as the pilot wished to turn. A shift to the right turned the steering rudder right by means of a cable and simultaneously warped the tips of the wings to bank to the right. A left movement steered and banked to the left. The Wrights' patent is fundamental in the principles of flight which are used in aeroplanes to-day— that is, it discloses the three movements mentioned.

In December, 1903, the Wrights made the first flight with an engine. The flight accomplishment was made possible, as one of the experts testified, "purely and simply by reason of this fact that they had under their control means for manipulating the horizontal elevator surface, means for controlling

the wing warping, and means for controlling the vertical rudder."

In 1905, the Wrights employed a separate control for the directional rudder, so that they had one lever for operating the elevator, and a separate lever for operating the wing warping with an independent control for the steering rudder. The plane was unstable, requiring constant manipulation of the controls to maintain equilibrium.

In the basic French patent (granted February 28, 1907), the aeroplane shows the arrangement of horizontal control levers. The stabilization producing lever (called the joystick by appellant) is shown and is operated by the pilot with his right hand. Moving the end of the stick up caused the plane to go up, and moving it down caused the plane to go down. Moving the stick left distorts the wings and causes the plane to roll or tip left, and moving it to the right causes the plane to move to the right. Sidewise movement of a similar stick with the left hand steers the plane to the left or right in a horizontal direction by operating the steering rudder. These two levers control the three fundamental movements of the plane—pitch, steering and roll. The first two movements are controlled by the right lever and the third by the left lever.

The patent in suit discloses three forms of aeroplane, two of which have never been built, ring tail and tandem wing monoplane, and the third, the bird tail, which was built. The control levers of the patent are vertical instead of horizontal as in appellant's 1906 patent. Figs. 6 and 10 show the control of the ring tail and bird tail modifications respectively. In Fig. 6 the right-hand lever is the same in function and operation as the right-hand lever of appellant's 1906 French patent. Moving the lever to the left rolls the plane to the left, and moving it to the right rolls the plane to the right. Moving the same lever forward causes the plane to nose down, and moving it backward causes the plane to nose up. The left-hand lever is moved forward to turn right and backward to turn the plane to the left in a horizontal plane. This steering is accomplished by twisting the ring with which the left lever is connected by a rod. The ring is mounted upon an eccentrically located ball-and-socket joint and carries both the vertical rudder and the horizontal rudders. Their action is interdependent. The levers in Fig. 10, the bird tail construction, are similarly arranged and operated.

Claims 2 and 5 to 9, inclusive, are in suit. They provide:

"2. An aeroplane having distortable wings for maintaining transverse stability, a rudder for maintaining longitudinal stability, a lever controlling said wings and said rudder, a steering rudder, and a separate lever controlling said steering rudder."

"5. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability.

"6. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, means for steering in a horizontal plane, a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability, and separate means for operating said steering means.

"7. In aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability, said single lever being operable by reflex movements of the body of an aviator to restore said aeroplane to an even keel when it departs therefrom in either a lateral or longitudinal direction.

"8. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction operating upon both said means for producing lateral stability and said means for producing longitudinal stability, said lever, upon forward movement thereof, operating said means for producing longitudinal stability to direct the aeroplane downwardly, said lever, upon rearward movement thereof, operating said means for producing longitudinal stability to elevate the aeroplane, said lever, upon movement thereof to the right and left, operating said means for producing lateral stability to raise the aeroplane on the left and right respectively.

"9. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability and a single vertical lever for operating both said means for producing lateral stability and said means for producing longitudinal stability. said lever being mounted upon an universal

joint and being oscillatable in every direction."

Thus claim 2 specifies distortable wings for maintaining longitudinal stability. Claims 5 to 9 specify the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction for operating both said means.

Of the three embodiments of the invention disclosed in the patent, the ring tail steers left or right by forward or backward motion of the steering lever; the bird tail steers left or right sometimes in response to the corresponding and sometimes in response to the opposite motion of the steering lever, depending upon the position of the joy-stick; and the tandem wing is controlled for pitch, roll, and steering by the two interdependent horizontal sticks constituting the "inherently defective" system of the 1906 French patent.

The operation of either lever of the ring tail and bird tail embodiments affects the pitch and yaw movement which cannot be controlled by either lever alone. In the ring tail construction the vertical rudders for steering in a horizontal plane and the horizontal rudders or elevators for steering up and down are rigidly mounted on the same ring. While performing any maneuver, the movement of the left-hand lever intended for steering in the horizontal plane affects the pitch of the machine, and the movement of the other lever intended for controlling the pitch affects steering by producing an undesired yaw. The same is true with respect to the bird tail construction. In that construction, these levers both act upon the same surface, and their operation is so interdependent that the action of the steering lever is reversed when the joy-stick passes through neutral in a vertical position. The court below found that the "two levers of the patent in suit are connected with the integral tail unit thereof and due to the interaction and confusion between pitch and yaw controls, inherent in the machine, pitch or yaw control cannot be effected solely by one stick, nor can either stick be released during control."

The advantage found or claimed by the appellant for both the French patent No. 372,753 and the patent in suit is the same; that is, the whole equilibrium of balance of the machine may be controlled by the pilot with one hand. The structure of the French patent was operative, and could be applied to a modern plane for control. Fig. 9 of the patent in suit embodies one form of the invention and is substantially identical with Fig. 2 of the French patent No. 372,753 and Fig. 3 of the French patent No. 373,818; the only difference being that the rigid wings of the French patent No. 372,753 have become warpable for lateral control instead of being rotated about a transverse axis, and also one of the wings has been converted into a bird tail for rotation about a longitudinal axis to simulate bird flight.

In French patent No. 373,818, the aeroplane of Fig. 3 is described as similar to the one which formed the subject-matter of French patent No. 372,753, and it is stated that the same control mechanism, which includes the horizontal lever, may be employed for controlling the machine. In both the French patent No. 372,753 and the patent in suit, appellant makes the same choice of putting longitudinal and lateral controls under one lever and putting the directional control under another, and the only difference here is the vertical position of the sticks instead of the horizontal position of the early French patent No. 372,753.

The appellant makes claim that there is an instinctive use by the operator of the control levers of the patent in suit in pushing forward to go down and pulling backward to go up. But the patent makes no claim that this operation is preferred to the opposite one of pushing forward to go up and backward to go down. It is not described as part of the invention. In Fig. 7a of the patent in suit, the joy-stick is shown connected by a rod to a vertical arm so that forward motion of the joy-stick causes the plane to point up and a backward pull pushes the plane down. It is agreed that this disclosure is unequivocal. The patent lays no emphasis upon either directional response in preference to the other. Indeed, this virtue on which appellant wishes to establish patentability is opposed by two out of the three embodiments illustrated and described, and, conceding that it is inherent in the third, it is not described as part of the invention, nor was it used in the only embodiment made by the patentee. No invention may be claimed for this. Permutit Co. v. Graver Corp., 284 U. S. 52, 52 S. Ct. 53, 76 L. Ed. 163.

Some judgments of the French courts with respect to the French patent of 1906 and its improvements were placed in evidence. The French courts attributed to the 1906 patent everything claimed in the patent in suit, including the single-hand operation of a control lever for both pitch and roll and a directional response in accordance with the

natural movements of the aviator. The subject-matter of the second and third French patents are treated as minor mechanical variations by the French judgments. Indeed, the appellant in his book published in 1918 refers to his 1906 patent describing a system having "the single lever acting in the direction of the pilot's reflexes."

The Laroze French patent No. 356,842 (1905), offered in evidence, relates to "Principles employed in the construction of an aeroplane to insure stability." It provides a "simple device" for controlling the evolution of the plane, namely an upstanding pivoted column or lever "which can alone give to the apparatus a sufficient latitude to enable it to make evolutions with ease." The so-called Dep. (Deperdussin) control consists of a wheel, much like an automobile steering wheel, mounted at the upper end of a vertical lever, and an equivalent form is an upstanding vertical column shaped as an inverted U-yoke surmounted by a wheel. The wheel is moved backward and forward to make the plane pitch up and down and is rotated left or right to operate the ailerons and bank to either side. It embodies the principles of the joy-stick control, and the lever in Laroze does likewise because it is simply the Dep. lever or column with movements about a vertical axis, substituted for movements about a horizontal axis, for lateral control simplified by mounting upon the column or lever the rudder control. This control could be handled by one hand much as an automobile steering wheel acts in response to a hand direction.

The Ferber publications of 1904 and 1906 show work as early as 1902 at the military air stations near Paris, and describe longitudinal and lateral controls by single means. Ferber's control means at first consisted of two, and later of a single, fore and aft horizontal stick, attached to an elevator and used for operating both the elevator and the "lateral control jibs." The pilot grasped one stick in each hand and pushed forward or pulled back to tilt the elevator in order to rise or descend. By moving the sticks sidewise, the operator operated the "lateral control jibs" to bank the machine. With a single horizontal control stick, which was later used, he could accomplish the same results. This was a prior publication (Rev. St. § 4923, 35 USCA § 72), and constituted prior art.

The Goupil article of 1884 in "La Locomotion Aerienne," described an aeroplane in which the longitudinal pitching and lateral banking controls were operated by a single vertical lever. The steering was accomplished by a separate lever. Goupil had a single lever for lateral and longitudinal control, and that is the substance of the appellant's claim.

In view of the prior art, we think there was no novelty in twisting the lever of the French patent No. 372,753 from a horizontal to a vertical position and substituting a lateral pivoting movement of the upstanding lever for a rotary movement, as in Laroze, or in changing a depending lever of Goupil to an upstanding lever or in grasping the levers of Ferber above the pivot instead of below the pivot. There is no novelty in the use of a lever to operate two or three controls, or in determining, as an engineering problem, the choice as to which of the three controls should be operated by a single lever. But for the bird tail or ring tail unit for control about the longitudinal and vertical axes, there is no invention.

The great advance in flying aeroplanes has been due largely to improved engines, the weight of which, per horse power, has been greatly reduced so as to make possible increased speed and power with the same weight. This largely accounts for the superiority of modern aeroplanes over the prior art.

■ Assuming the validity of the patent in suit, it must be limited to the structure disclosed employing the bird tail or ring tail unit for control about the longitudinal and vertical axes with a restricted range of equivalents.

■ The acquiescence in the rejection of claims 12 and 13 estopped assertion of the claims in suit to include what was rejected. Appellant contends that claims 5 to 9 are the same as claims 12 and 13, and that, 5 to 9 having been granted, there can be no estoppel. Appellee contends that the patent attempts an illegal expansion of the original claims. The rejection of a broad claim, accompanied by the acceptance of a narrower claim, estops the patentee from asserting an interpretation of the narrower claim to include what was rejected. Harvey Hubbell, Inc., v. General Elec. Co., 267 F. 564, 570 (C. C. A. 2). But there is no estoppel if, subsequent to the rejection of a claim, an equally broad claim is allowed. Overland Motor Co. v. Packard Motor Car Co., 274 U. S. 417, 421, 47 S. Ct. 672, 71 L. Ed. 1131. This issue of estoppel arises only if the infringing device comes within the language of the rejected claim.

Claims 12 and 13 refer to an "aeroplane having means for controlling its inclination and a single lever for operating said means to control both the longitudinal and the transverse stability of the apparatus, said lever being arranged to oscillate in different vertical planes, means for transmitting its movement in one plane to the means for governing the longitudinal inclination, and means for transmitting its movement in the other plane to the means for determining the transverse stability." Claims 5 to 9 speak of means for "producing" lateral and longitudinal stability and the single vertical lever movable in every direction for operating said means.

Since the patent is not valid in any broader sense than the ring and bird tail modifications, the appellant obtains no benefit from the rejected claims. And even if a broader construction were adopted, the appellant is estopped to assert that claims 5 to 9, which were allowed, include whatever is additional in the broader language of claims 12 and 13 which were rejected with acquiescence.

The allegedly infringing machine (appellee's Corsair) is different from that of the patent in suit both in means of operation and control. The Corsair machine is designed and built to be inherently and automatically stable. It may be flown with hands off the controls for long distances at a time. The controls are usually operated when it is desired to overcome the automatic stability of the plane, in order to execute some movement such as taking off, landing, or making a bank.

The patent provides for a monoplane with distortable wings and no ailerons, while the appellee's machine is a biplane with rigid wings and ailerons pivoted on the wings. The patented machine has a steerable birdlike tail and wing warping to produce lateral stability. Appellee's machine has a fixed tail with movable trailing surfaces and wing dihedral, vertical fin and sweepback, all fixed, for automatic lateral stability. The patent has a steerable tail for longitudinal stability; appellee has a nonsteerable stabilizer for longitudinal stability, adjustable by hand wheel. The patent has a single lever for longitudinal stability and ascension and descension; appellee has a side wheel for longitudinal stability and dual levers for ascension and descension. The patent has a single lever for yaw control; appellee has two pairs of suspended stirrups for yaw controls. The patent has a single lever for manual production of transverse stability and longitudinal stability; appellee has automatic transverse and longitudinal stability supplemented by the side wheel stabilizer adjustment for longitudinal balance. The patent has levers to produce stability; appellee has handles to produce instability by destabilizing the machine for an evolution. The patent has hand-produced stability or equilibrium, laterally, longitudinally and directionally; appellee has automatic stability, laterally, longitudinally, and directionally. The patent has continuous hand lever manipulation for producing stability at all times; appellee has automatic stability at all times, occasionally using the controls for accentuating the automatic stability characteristics.

In blind flying, inherent stability is provided for in the modern aeroplane. No matter how experienced the pilot may be, he cannot keep a plane in a proper horizontal and vertical position in a fog but for a few minutes, when unable to see the ground, but, with an automatic stability, he may do so, and, in the appellee's machine, he can fly far better by keeping his hands off the controls. In the patented plane it would be necessary for the pilot to maintain equilibrium solely by manipulation of the control levers.

There is no claim in the patent in suit which may be construed to include the appellee's device without being invalidated by the prior art, and the court below was right in holding that there was no infringement, assuming the patent to be valid over the prior art.

Claim 2 calls for an aeroplane having distortable wings, but the appellee has ailerons for manipulation instead of such wings for producing stability. It specifies also that the distortable wings are for maintaining transverse stability and requires a rudder for maintaining longitudinal stability. Neither requirement is found in appellee's machine, since both transverse and longitudinal stability are inherent. They need not be maintained by distortable wings or operation of the elevator.

Claims 5 to 9, inclusive, specify a combination of means for producing lateral stability, means for producing longitudinal stability (which signify the distortable wings and tail), and a single vertical lever movable or oscillatable in every direction for operating both said means. The appellee's machine does not have these. The means for producing lateral stability and the means for producing longitudinal stability are built into the plane and are incapable of operation by a single vertical lever. Except for the stabilizer, they are not under the control of the pilot and are incapable, therefore, of any opera-

tion, and the stabilizer can only be adjusted by the hand wheel at the side of the fuselage. The other means for producing lateral and longitudinal stability—the dihedral angle, the sweepback, and the vertical fin—are permanently fixed and cannot be operated by any means. There was no infringement in the construction of the appellee's machine.

Decree affirmed.