## ALEOGRAPH CO. v. WESTERN ELECTRIC CO., Inc.

### No. 138.

Circuit Court of Appeals, Second Circuit.

Jan. 15, 1934.

Sidney Rosenbaum and Frank H. Booth, both of New York City (Williams, Rich & Morse and G. Willard Rich, all of New York City, of counsel), for appellant.

Henry R. Ashton and F. T. Woodward, both of New York City, for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This patent was considered in a suit by the appellant against a subsidiary corporation, the appellee in the case of Aleograph Company v. Electrical Research Products Inc., 55 F.(2d) 106 (C. C. A. 5), where all the claims now sued on, except claim 15, were held not to have been infringed by the machine built in like form and structure to the machine charged herewith with infringement. It is claimed that the evidence here has been much amplified and is against a different party defendant and therefore requires consideration of the present argument as to infringement. The machine is manufactured by the appellee and distributed by the Electrical Research Products, Inc.

Patent No. 1,494,514 was issued May 20, 1924, on an application filed October 1, 1921, and claims 1, 3, 15, 19, and 20 are in suit. The specifications of the patent provide for the means of producing as well as reproducing talking motion pictures. But the claims in suit relate to reproduction and particularly that type in which a separate phonograph is employed. The sound is on a separate phonograph and not on the film with the pictures. The so-called "sound on film" system is the type in which the sound is a photographic record and is located on the same film with the pictures. Appellee's machine may be used for "sound on film" production with the aid of a disc device.

It was not new, when the application was filed in October, 1921, to record and reproduce sound in synchronism with motion pictures, as was pointed out by the patent office when the application was first considered, and the features which were ultimately allowed as patented to appellant, at least in the claims sued on, were specific means for re-establishing synchronism at any point throughout the length of the picture film, if the film breaks with means for automatic and instantaneous cutting off the transmission and reproduction of sound when the film breaks. Claims 1, 3, and 15 do not cover the original placing of a picture film and phonograph record in synchronism at the beginning of the two records. The resynchronizing feature is referred to in the patent. There it is pointed out that the invention provides means to enable the projection of a picture to be continued in synchronism with the corresponding or accompanying sound after breakage of the film has occurred, and provision is made to

re-establish synchronism between the sound record and the picture film at any point in the length of the film. An automatic switch feature is described as providing a means for immediately interrupting or suppressing sound should breakage of the film occur during this projection.

The machines of both parties have in common (a) a projector, (b) a phonograph, and (c) a mechanical driving connection between the projector and the phonograph. These three elements were well known to the prior art and are described in prior patents. When the patentee claimed these broadly in old combinations (original claim 3), they were required to cancel them upon rejection. They may not now be claimed by an interpretation of the allowed claims commensurate in scope with the canceled claims. Esnault-Pelterie v. Chance Vought Corp., 66 F.(2d) 474 (C. C. A. 2); Enison-Freeman Co. v. Levy, 55 F.(2d) 1057 (C. C. A. 2); Deitel v. Unique Specialty Corp., 54 F.(2d) 359 (C. C. A. 2); Knowles v. 138 West 42nd St. Corp., 43 F.(2d) 929 (C. C. A. 2).

The means of the patent for re-establishing synchronism between the projector and phonograph includes a tooth clutch interposed in the mechanical driving connection. This clutch enables the operator to disconnect the projector and phonograph. When closed, there is a positive mechanical driving connection and, when open, either the projector or phonograph may be operated by hand independently and without operating the other of these two devices. The patent's phonograph record support is a cylindrical mandrel—not a turntable—and connected with the mandrel, so as to revolve therewith, is a revolution counter, a part of the resynchronizing means. This counter is actuated once for each revolution of the record mandrel. It registered the number of mandrel revolutions. The specifications of the patent say that the projector will project 16 pictures or one foot of film for each revolution of the mandrel. The clutch has 16 teeth, one for each of the 16 pictures in each foot of film. The record mandrel is divided into 16 divisions or sectors which are marked on the mandrel. The marks correspond with the 16 picture marks on each foot of film. Should the film break and the synchronism be lost, the sound will be stopped instantaneously by the automatic operation of the film switch. The operator can stop the machine by cutting off power, then rethread the film at a convenient point beyond the break. He will look at the two film indices, first the footage index and then the individual picture index, noting the number of feed and also the number of the individual picture opposite the projector gate which corresponds to the camera lens. With this information, he may disconnect the clutch and move the phonograph mandrel until the revolution counter indicates the proper number of revolutions. The mandrel is then further rotated until the corresponding individual picture index mark is opposite the reproducer needle. Then, closing the clutch, synchronism is reestablished.

The appellee's machine, claimed to infringe, is a part of its "sound on disc" reproducing system. The picture films and phonograph record used in theaters are prepared from the original film and phonograph record respectively. There is a projector of the standard type used in projecting silent pictures. It is connected to a motor by means of shafts and a gear box. A reproducing turntable, which supports and rotates a disc is connected to the motor through gears, a mechanical filter and a shaft. These shafts, connecting gears and filter, form a positive unbreakable connection with the projector and turntable. The projector and turntable can only be moved together. No clutch or other disconnecting element is located anywhere in this direct mechanical drive. An electrical reproducer converts the sound waves stored in the form of physical undulations on the surface of the record, back into electrical waves. The waves are enormously amplified by vacuum tube amplifiers, similar to those used in recording, from which they are conveyed by wire to a loud speaker behind a screen on the stage. A picture at the beginning of the film bears the word "Start," and similarly the beginning of the groove on the disc record is indicated by an arrow. Each of these marks corresponds to a similar mark made on the original picture and sound records when recorded. By placing the word "Start" on the film opposite the lens in the projector and the needle of the producer opposite the arrow on the disc record, the picture and sound record are in a position to start in synchronism. The projector and turntable are geared to run at the same speed as the recording camera and turntable, thus giving assurance of synchronism by the unbreakable mechanical driving connection and the motor. The motor is driven by a special control mechanism at the same speed used in recording. The sound record may be placed by the operator at any point on the turntable, that is, if the arrow in the first instance is not opposite the reproducer needle, the record is

slid around on the surface of the turntable until the arrow and needle register. A clamp or weight, which serves to hold the record against slippage on the flat surface of the turntable, is then put in place.

Film breakage was a problem which has been solved by having the editing of the film completed on the original negative itself. The positives used in theaters are now printed from the spliced negative and are themselves continuous and unspliced. As a result few spliced films are used to-day and interruption has been reduced to a negligible quantity. Therefore the appellee makes no provision in its machine to permit synchronism to be re-established in the event that the film should break during projection. Using the appellee's machine, when the film does break during projection, the operator may repair the film, rewind it, and start at the beginning again; the reproducer being placed back at the beginning of the record opposite the start indicating arrow. This causes delay. The operator may choose to rethread the film beyond the break, thus eliminating the time needed to splice the film, and project the remaining film as silent pictures, by removing the reproducer from the sound record or otherwise cutting off the sound transmission to the loud speakers. This would be suitable if the break occurred somewhere near the end of the film, because then the sound would not be absent sufficiently long to be troublesome. The operator may omit altogether the remainder of the reel containing the break and start with the next reel of film. In any event, it is very apparent that the appellee's machine has no means or method for setting the picture and the accompanying sound back in synchronism with each other once synchronism has been lost by the breakage of the film.

In the appellee's practice, with a practical elimination of film breakage, there is no occasion for automatic means or a switch for cutting off the sound to accommodate film breakage as provided in the appellant's machine. In the appellee's machine, if the sound is cut off or discontinued at all before the machine stops, either by running down or by applying the brake, the sound will not and cannot be interrupted or cut off instantaneously or by automatic means operating in consequence of breakage of the film. The sound either "whines" itself out or is discontinued, when the operator discovers the film is broken, by the manual movement by the operator of a fader having no mechanical operative connection whatsoever with the machine. The purpose of the fader is not to dis-

continue the sound if the film breaks, but to blend the sound at the end of the record on one machine with the sound at the beginning of the next record to be reproduced on the companion machine. Two machines are now used in theaters so that a show may be continuous, a single film and record not being of sufficient length for one full performance. The fader is operated manually by a hand knob. If the knob is turned so that the pointer points to any of the numerals or steps opposite the right-hand sector, the sound from the right-hand machine is reproduced in the theater and, conversely, if the knob is moved so that the pointer points to any of the numerals on the left-hand sector, the sound from the left-hand machine is reproduced. When shifting over from one machine to the other, during the progress of the show, the operator starts the second machine shortly before the film and record of the first machine have run out and then, just as the film and record are about to run out, he quickly moves the fader from one side to the other; the sound of one machine dies out or fades and the sound from the other machine is brought in. The volume of sound is determined by the position of the fader.

It was claimed at the trial that the appellee's projector and phonograph might be continued to be operated in synchronism if the film should break at a point below the so-called intermittent film sprocket in the picture projector. This sprocket is intermittently driven below the projector lens and pulls the films through the projector and is driven in synchronism with the phonograph. If a break occurs below this sprocket, the film, which has never lost engagement with the sprocket teeth and therefore has never gone out of synchronism with the phonograph, can be rethreaded below the sprocket and the machine started again. But this is due to the fact that synchronism has never been lost.

The appellant's machine has an automatic film switch for instantaneously interrupting the transmission of sound or de-energizing the loud speaker in consequence of film breakage during projection. This automatic switch is so constructed that if the film breaks a shaft will rotate causing the contact breaker to fall and separate contacts thus instantaneously and automatically interrupting transmission of the sound to the loud speaker. In consequence of such film breakage the sound is both instantaneously and automatically stopped.

But the appellee's machine in the use of a fader does not have a device the equivalent of

the automatic film switch. Claims 19 and 20 are limited to automatic means in the form of a film switch operated by breakage of the film to stop the sound without depending on or waiting for the operation of the projector and phonograph to be stopped. This is the inventive feature of the claims upon which allowance of claims was sought and obtained. It is claimed that the appellee's manual fader is an equivalent of the automatic film switch. As pointed out, the appellee's fader does not perform the same function as the appellant's automatic switch nor does it accomplish the same results. One is an automatic means; the other is manually handled and there is no equivalency. Dudlo Mfg. Co. v. Varley Duplex Magnet Co., 253 F. 745 (C. C. A. 7). Claims 19 and 20 are each limited to automatic means for stopping the sound when the film breaks, and they are not infringed by the manual operation of the fader when the operator discovers that the film is broken.

Claims 1, 3, and 15 are definitely limited to resynchronizing features of the appellant's machine. "Sound on film" reproduction is accomplished in appellee's machine by an entirely distinct mechanism, containing a source of light, optical system and photo-electrical cell by which the photographic record printed along the edge of the film beside the pictures may be translated back into sound waves. In the manufacture of the film the pictures and sound corresponding thereto are printed on the single film adjacent to each other so that they will always be in synchronism; thus synchronism is permanent. All that is necessary is to rethread the film. Claims which have to do only with putting two things in synchronism, when synchronism has been lost, have nothing to do with a "sound on film" machine in which the sound and pictures are on the same film and synchronism never lost.

Claims 19 and 20 contain the three elements of picture machine, phonograph, and means for operating them together in synchronism, referred to above, which were old in combination in the prior art. Each claim is limited to an additional element not used in appellee's machine; that is, the automatic means or film switch for interrupting the transmission or reproduction of sound when the film breaks. The automatic means of claim 20 is definitely stated to be a switch controlled by the film. In claim 19 the same automatic means for interrupting the sound in consequence of film breakage, as required by the claim, must be operated independently of

the operation of the phonograph and projector; it must operate instantaneously to cut off the sound without waiting for the operation of the phonograph and projector to cease. These claims are not infringed.

We do not pass on the validity of the patent in suit, for we find that there was no infringement of any of the claims in suit.

Decree affirmed.